**EUCLID ENERGY LIMITED,**
**f/k/a Blue Ocean Baltic**
**Limited, Plaintiff,**

v.

**SIA VENTALL TERMINALS,**
**Defendants.**

**No. 09 Civ. 988(CM).**

United States District Court,
S.D. New York.

Feb. 11, 2009.

Lawrence Jay Kahn, Freehill, Hogan & Mahar, LLP, New York, NY, for Plaintiff.

## ORDER DENYING REQUEST FOR EX PARTE ATTACHMENT AND DIRECTING THAT THE CASE BE DISMISSED

McMAHON, District Judge:

The court has reviewed the Verified Complaint and supporting papers in this matter, which requests an *ex parte* order of attachment in connection with an arbitration having nothing to do with this district. I conclude that I have no jurisdiction under Admiralty Rule B to sign the *ex parte* order, and so decline to do so. Since the Verified Complaint fails to state a claim in admiralty and no other basis for exercising jurisdiction is apparent from the face of the pleading, the complaint is dismissed.

### Background

Plaintiff Euclid (previously known as Blue Ocean Baltic Limited) was and still is a business entity organized and existing under the laws of a foreign country, with an address at Cornel Associates, 117 Alexander Park Road, Muswell Hill, London, N102DP, England. Defendant SIA Ventall Terminals ("Ventall")was and still is a foreign business entity organized and existing under laws of a foreign country with an address at Dzintaru 66, Ventspils 3602, Latvia.

Euclid entered into a lease-and-services contract with Ventall on or about April 12, 2006. The contract related to terminal facilities and services, including tanks, rail and other ancillary equipment and facilities at a terminal in or near the port of Ventspils, Latvia. The express purpose of the lease was to provide Euclid with a facility where gasoline manufactured in Kazakhstan and other former Soviet states could be upgraded so that it could be exported to countries where emissions standards are higher and marketing requirements more stringent, such as Nigeria, Western Europe, the Middle East and the United States. Ventall operates a facility where gasoline and other petroleum products are stored and blended with the necessary additives prior to being exported. The contract between plaintiff and defendant is not a contract for the transport of good by sea; it is not a bill of lading.

The papers before the court do not specify how the gasoline gets from its original place of manufacture (Kazakhstan or wherever) to Latvia, but the fair implication is that the gasoline arrives in Latvia by land transport. In its memorandum of law in support of the application for Rule B attachment, Kazakhstan is specifically mentioned as a country where Euclid manufactures gasoline. Kazakhstan is a landlocked country, from which it would be very difficult to transport products by sea. Moreover, the pleading itself specifically alleges that Euclid rented storage space at the terminal "for the purposes of *export by sea*" and that Euclid "regularly brought vessels into the terminal for *loading of oil*

*and other gasoline products . . . ."* (Ver. Cplt. ¶ 4). The complaint does not allege that Euclid's products arrive at the terminal by sea, or that Euclid off-loads products from ships into the leased facilities. Absent any such allegation, this court concludes that only the treated gasoline—the finished product, ready for export—is moved by ship. It is loaded onto those ships at docks adjacent to the leased facility, and the lease gives Euclid the right to tie up at those docks for the purpose of receiving product.

Euclid claims that Ventall terminated their contract lease prematurely, thereby denying Euclid use of the storage and treatment facilities. Euclid claims to have lost more than $46.8 million in sales, plus interest and costs, as a result of Ventall's wrongful termination of the lease.

The contract between the parties provides for the resolution of disputes by arbitration before the ICC at Zurich, Switzerland. Arbitration between the parties was commenced on August 22, 2007, and is ongoing. (*See* Plaintiff's Mem. at 1–3).

*The Contract Is Not A Maritime Contract*

The contract in this case is a lease for facilities where the oil can be treated so that it can be sent on to plaintiff's customers, and for services relating to that treatment. Once the oil is treated, it is transferred to ships, on which it journeys across the seas to those who have purchased the product from plaintiff.

Plaintiff contends that, because the gasoline will ultimately end up being transported in maritime commerce (i.e., on ships), the lease for the facility where the gasoline is upgraded qualifies as a maritime contract, thus permitting this court to exercise *quasi in rem* jurisdiction over assets of defendant that may be found in this district, pursuant to Supplemental Rule B. The only assets that might be in this district appear to be funds that are temporarily moving through the international banking system and that, as part of their journey, flow (in a purely electronic sense) through one of the many international clearing house banks located in Manhattan.

Simply setting this down on paper exposes the weakness of plaintiff's jurisdictional claim: (1) that an American court has the power to attach money belonging to a Latvian company with no asserted American contacts, (2) in order to secure an eventual judgment in what is essentially a landlord/tenant dispute that is presently being decided in an arbitration before the ICC at Zurich, Switzerland, (3) simply because the product that would have been stored and treated in the leased premises would eventually find its way onto a ship.

Plaintiff argues that the essential maritime nature of the contract for the use of the Latvian facilities lease was settled by the United States Supreme Court in *Norfolk Southern Railway Co. v. James N. Kirby, Pty Ltd.*, 543 U.S. 14, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004). I believe the Supreme Court would be astonished to learn that *Kirby* accomplished such a result.

*Kirby* settled the question of whether certain through bills of lading for the intermodal transport of goods from Australia to Alabama were maritime contracts in nature even as to that portion of the intermodal journey that was to be accomplished by rail rather than by ship. The *Kirby* court held that the bills of lading—essentially, contracts for the shipment of goods—were maritime in nature, which meant that certain limitations on coverage written into them under federal law trumped state negligence law. Nothing in *Kirby* suggests that the Supreme Court ever thought about whether a claim for breach of a non-transportation contract between two foreign corporations fell within

the admiralty jurisdiction of the United States simply because goods that were the subject of that contract would eventually have ended up on ships, for carriage to unspecified destinations (not necessarily the United States).

Furthermore, there is nothing about the nature or character of the contract between the parties that is maritime in nature. The contract between the parties is for a lease of rail and land-based storage facilities in Latvia, as well as for services appurtenant to the addition of additives to gasoline manufactured in the former Soviet Union. This is not a contract for the carriage of goods, as was the case with the bill of lading in Kirby. Furthermore, the primary object of the contract is not accomplish the transportation of goods by sea. Nothing in the papers before the court suggests that ships would refuse to carry the gasoline unless it were treated. Rather, Euclid needs the services contemplated by the contract because it chooses to sell its product to customers who must comply with more stringent environmental and other regulations that are imposed by the countries where the gasoline is originally manufactured. The fact that Euclid uses ships to transport its finished product to at least some of its ultimate customers [1] does not transform the lease-and-services contract here at issue into a maritime contract. If it did, then any contract relating to the manufacture or storage of goods anywhere in the world would fall within the maritime jurisdiction of the United States as long as the goods that were the subject of the contract were someday going to find their way onto a ship. This court cannot endorse such an unprecedented extension of this country's jurisdiction over matters that have nothing to do with United States commerce.

Nonetheless, I cannot fault counsel for trying to stretch *Kirby* and Rule B to cover this transaction. Word about the Second Circuit's decisions in *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434 (2d Cir.2006) and *Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263 (2d Cir.2002)—which, in cases of actual maritime jurisdiction, permit the "attachment" of bookkeeping entries representing funds that are moving through the international bank clearing system—has obviously gotten out to the wider bar. *Aqua Stoli* and *Winter Storm* permit one party to a dispute that has absolutely nothing to do with the United States to obtain leverage (sometimes to a degree approaching extortion) over an opponent who has no property in this country, but who, through no fault of its own, cannot pay a bill or collect on an account without having its money "pass through" New York City in the form of an electronic "blip" on a clearing bank's computer. The only limitation on this expansive form "attachment" is that the underlying dispute must be maritime in nature. As a result, the game has become to find ways to characterize contracts as "maritime." In the past few months, this court has been presented with papers alleging that Rule B attachments are warranted in a number of cases where the underlying contracts are not even remotely maritime in nature—some, as in this case, as an afterthought, months or years after the commencement of litigation elsewhere to resolve the underlying dispute.

The question arises whether the court should simply sign the Rule B order of attachment and determine the issue of jurisdiction in the context of a motion to vacate (assuming, of course, that Ventall would appear in an American court) pursu-

---

1. For example, EUCLID might well ship gasoline into Western Europe by rail or by pipeline.

ant to Supplemental Rule E(4)(f). But where jurisdiction is so obviously lacking, I would be abdicating my duty to ensure that Rule B is being utilized in a constitutional manner if I were to follow such a procedure. Instructive on this point is the Committee Note that accompanied the 1985 amendment to Rule B:

> Rule B(1) has been amended to provide for judicial scrutiny before the issuance of any attachment or garnishment process. [Prior to the amendment a plaintiff seeking a maritime attachment need only receive approval from the Clerk of the Court.] Its purpose is to eliminate doubts as to whether the Rule is consistent with the principles of procedural due process enunciated by the Supreme Court.... The rule envisions that the order will issue when the plaintiff makes a *prima facia showing that he has a maritime claim* against the defendant in the amount sued for and the defendant is not present in the district.

Proposed Amendment to the Supplemental Rules for Certain Admiralty and Maritime Claims, 105 F.R.D. 179, 229–231 (April 29, 1985) (citations omitted) (emphasis added).

Maritime attachments arose and are justified because it was generally more difficult to find the parties and the property involved in maritime disputes than those involved in other civil actions. *See Aqua Stoli,* 460 F.3d at 443. The purposes of maritime attachments have been to gain jurisdiction over an absent defendant and to assure satisfaction of an eventual judgment. *Id.* at 437. Those purposes are served by a policy of allowing attachment of maritime assets where they are found, rather than requiring a plaintiff to search for a proper forum for suit involving tran-

sient defendants and their assets. *Id.* at 443. Rule B was amended in 1985 to include judicial oversight of attachment applications to ensure that only maritime claims receive this special treatment under the rules.[2] The case at bar does not present a maritime claim. To allow plaintiff to attach defendant's funds if they should happen to flow through this district—especially in the extraordinary amount here claimed (plaintiff is seeking to attach $58,076,351.95 in funds)—would negate one of the constitutional safeguards written into Rule B.

The court concludes that plaintiff has failed to make a prima facie showing that the contract in suit is a maritime contract, and so declines to enter the Rule B attachment order. Because no other basis for jurisdiction over this dispute is asserted, I direct the Clerk of the Court to dismiss this Rule B action *sua sponte.* If plaintiff believes that I have declined to sign this order in error, it is free to seek an order of mandamus from the United States Court of Appeals for the Second Circuit.

This constitutes the decision and order of the Court.

---

**2.** While Rule B as amended provides for the issuance of a maritime attachment without judicial approval when exigent circumstances are present, the Rules Committee observed that every effort to secure judicial review, including conducting a hearing by telephone, should be pursued before resorting to the exigent-circumstances procedure. 105 F.R.D. at 232.