# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 24, 2013

No. 12-30668

Lyle W. Cayce
Clerk

PT. JAWAMANIS RAFINASI; XL SPECIALTY INSURANCE COMPANY,

Plaintiffs–Appellees,

v.

COASTAL CARGO COMPANY, INCORPORATED,

Defendant–Third-Party Plaintiff–Appellant,

v.

BABCOCK & WILCOX POWER GENERATION GROUP, INCORPORATED,
formerly known as Babcock & Wilcox Company,

Third-Party Defendant–Appellee.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:09-CV-7490

Before DeMOSS, DENNIS, and PRADO, Circuit Judges.

PRADO, Circuit Judge:[1]

This dispute focuses on damage to a boiler that occurred while the boiler was being loaded onto a ship. Before trial, the parties resolved all issues of liability and damages. They stipulated that only two issues remained for the

---

[1] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-30668

district court to consider: (1) whether the stevedore company that negligently damaged the boiler could limit its liability under the Carriage of Goods at Sea Act ("COGSA"); and (2) whether the boiler's manufacturer was liable in whole or in part for the boiler's damage. The district court determined that the stevedore company was solely liable for damaging the boiler and that the stevedore company could not limit its liability. Only the limitation of liability issue was appealed. For the reasons that follow, we reverse the district court.

## I

In November 2008, a boiler unit was manufactured for Plaintiff Pt. Jawamanis Rafinasi ("Rafinasi"), an Indonesian company. The boiler was shipped to defendant Coastal Cargo Company, Inc. ("Coastal") in New Orleans, Louisiana. There, the boiler would be loaded onto a vessel owned by Rickmers-Linie ("Rickmers") and shipped to Rafinasi in Indonesia.

Coastal was hired to serve two specific roles with respect to the boiler. First, Coastal was retained by Rafinasi's agent, ATS International, to unload the boiler from the manufacturer's railcar, store the boiler until Rickmers's ship arrived, and then move the boiler shipside for loading. Second, Coastal also had an existing contract with Rickmers to serve as its exclusive stevedore in New Orleans.

The boiler itself was extremely large and unwieldy. It weighed approximately 143,300 pounds and—due to its size and construction—was heavier on one side than the other, causing an asymmetrical distribution of weight, which necessitated the use of large cement counterweights. When the boiler arrived at Coastal's facilities, Coastal employees immediately realized that the boiler was heavier on one side than the other because of the presence of counterweights and the location of the lifting lugs.

Due to the boiler's size and weight distribution, Coastal employees used the largest trailer they had, and positioned it so that the trailer could be driven

2

in a straight line to the storage location. Coastal's employees believed that the boiler might fall off the trailer if the truck had to make any turns. The boiler was successfully offloaded from the manufacturer's railcar and driven to its storage location to await the arrival of Rickmers's vessel.

On December 1, 2008, Rickmers's vessel arrived at the wharf to receive the boiler. Ronald Rose was the vessel's port captain that day. Rose was charged with planning how to load the boiler, working with Coastal to ensure they understood the plan, and acting as the liaison between Coastal and the vessel's crew to ensure the boiler was loaded in a safe and correct manner. After Rose indicated that he was ready to load the boiler, Coastal's employee successfully drove the trailer in a straight line until it was alongside the ship. However, Rose did not believe that the boiler could be loaded onto his ship from its current position because the boiler's lifting points were too far away. He thus instructed Coastal's employees to move the boiler closer to the ship. In attempting to reposition the boiler, Coastal's driver turned the truck away from the vessel. In so doing, the boiler fell from the trailer and sustained significant damage.

Rafinasi and its insurance company ("Plaintiffs") filed suit against Coastal on December 1, 2009, alleging that Coastal's negligence caused the boiler's damage, and that Coastal was liable for breach of warranty and contract. Plaintiffs sought $284,415 in damages, as well as fees, interest, and costs. On December 16, 2010, Coastal filed a third-party complaint, claiming that the manufacturer's conduct contributed to the boiler's damage. At a pretrial conference, the parties indicated that they had resolved all outstanding issues except for two specific disputes: (1) whether COGSA limits Coastal's liability to Plaintiffs, and (2) whether the manufacturer was liable for negligently causing or contributing to the boiler's damage. They submitted briefs, evidence, and joint deposition testimony so that the district court could resolve these claims without a full bench trial. The district court held that Coastal's liability was not

No. 12-30668

limited by COGSA because Coastal was not an agent of Rickmers when the boiler was damaged. The district court also found that Coastal was solely liable for damaging the boiler. Coastal filed this appeal, challenging—on two separate grounds—the district court's COGSA determination.

## II

As this is a direct appeal from the final decision of the district court, we have jurisdiction pursuant to 28 U.S.C. § 1291.

## III

### A

As an initial matter, a dispute exists as to which standard of review applies to this case. The parties agree that factual findings are reviewed for clear error, while conclusions of law and mixed questions of law and fact are both reviewed de novo. *See St. Joseph Abbey v. Castille*, 700 F.3d 154, 159 (5th Cir. 2012); *Richards v. Quarterman*, 566 F.3d 553, 561 (5th Cir. 2009). They disagree, however, about whether finding an agency relationship constitutes a finding of fact, a conclusion of law, or a mixed question of fact and law. As explained below, this dispute has no bearing on the outcome of the case since the Court need not conduct traditional agency analysis in order to dispose of the issues presented. The terms of the bill of lading unambiguously resolve the question of limiting Coastal's liability. Therefore, all that remains is a question of contract interpretation, which is reviewed de novo. *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004).

### B

COGSA contains a "package limitation" that limits the liability of carriers for loss of or damage to goods being shipped overseas. *See Tradearbed Inc. v. W. Bulk Carriers K/S*, 374 F. App'x 464, 472–73 (5th Cir. 2010) (per curiam) (unpublished). However, the package limitation only applies from the time goods are loaded onto the ship to the time the goods are discharged from the

ship. *Norfolk S. Ry. Co. v. James N. Kirby Pty Ltd.*, 543 U.S. 14, 29 (2004). The parties do not dispute that the boiler had not been loaded onto the vessel when the damage occurred. Coastal thus cannot directly limit its liability through the COGSA package limitation. Instead, Coastal seeks to take advantage of the package limitation through its contract with Rickmers.

While the COGSA package limitation does not, by its terms, apply to goods before loading or after unloading, parties can extend the package limitation's coverage to include these periods. COGSA § 7, ch. 229, 49 Stat. 1207 (1936), reprinted in 46 U.S.C. § 30701 (2006) (previously codified at 46 U.S.C. § 1304(5) (2000)) ("Nothing contained in this chapter shall prevent a carrier or a shipper from entering into any agreement . . . for the loss or damage to or in connection with the custody and care and handling of goods prior to the loading on and subsequent to the discharge from the ship on which the goods are carried by sea."). Here, it is undisputed that Rickmers's bill of lading[2] extends the COGSA package limitation to "before the Goods are loaded on or after they are discharged from the vessel" so long as the "Goods at said time are in the actual custody of the Carrier or any Servant or Agent." Moreover, Rickmers's bill of lading defines "Servants or Agents" as including, *inter alia*, "stevedores . . . and any independent contractors employed by the Carrier in the performance of the Carriage."

The district court, relying on nine considerations of fact, ultimately concluded that Coastal was not acting as Rickmers's agent and thus could not avail itself of the COGSA extension contained in Rickmers's bill of lading.[3]

---

[2] "A bill of lading records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage." *Norfolk*, 543 U.S. at 18–19.

[3] The district court listed the following considerations: (1) Under Rafinasi's contract with the manufacturer, Rafinasi was responsible for the boiler once it was delivered to New Orleans; (2) Rafinasi retained ATS for terminal handing and port labor regarding the boiler;

Specifically, the district court held that Coastal was not under Rickmers's control when the boiler was damaged. Rather, Coastal was fulfilling its obligation to ATS and Rafinasi. Therefore, according to the district court, the COGSA package limitation did not apply to Coastal.

The district court and the parties exclusively dedicate their argumentative resources to considerations of agency law. However, Rickmers's bill of lading defines the term "Servants or Agents." That is, the district court's opinion and the parties' briefs on appeal focus on whether Coastal was acting as Rickmers's agent when the boiler was being loaded using common-law agency analysis without confronting the fact that the bill of lading provides its own definition for "Servant or Agent" that clearly encompasses Coastal, Rickmers's stevedore.[4] The Supreme Court has clearly stated that bills of lading are contracts subject to ordinary rules of contract interpretation. *Norfolk*, 543 U.S. at 31 ("[C]ontracts for carriage of goods by sea must be construed like any other contracts: by their terms and consistent with the intent of the parties."). Where, as here, a bill of lading specifically lists stevedores as agents included within the COGSA package limitation, the limitation necessarily applies. *Cf. Robert C. Herd & Co. v. Krawill Mach. Corp.*, 359 U.S. 297, 302 (1959) (holding that COGSA liability

---

(3) Coastal invoiced ATS for terminal handling of the boiler; (4) Coastal and Rickmers entered into a contract whereby Coastal would serve as Rickmers's exclusive stevedore in New Orleans; (5) Rickmers's booking note stated that Rickmers's boiler-related responsibilities were restricted to the time at which the boiler was hooked and loaded to the time the boiler was unloaded; (6) Rafinasi was required to provide special lifting devices for the boiler, if necessary; (7) Rickmers's vessel captain instructed Coastal to move the boiler for loading, but did not specify how to do so; (8) the boiler was never hooked up to or loaded onto the vessel; and (9) Coastal's employees should not have moved the boiler without consulting supervisors.

[4] It is possible that the district court and Plaintiffs do not believe the bill of lading's terms apply to this case because the bill of lading was never formally issued, given that the boiler was damaged before it could be loaded on Rickmers's ship. To the extent this is a substantive objection to limiting Coastal's liability under the bill of lading, it is addressed later. However, the district court and the parties nevertheless appear to treat the bill of lading as binding.

limitation did not apply to a stevedore when the bill of lading merely limited "the Carrier's liability" because, "[i]f [including the stevedore] had been a purpose of the contracting parties it must be presumed that they would in some way have expressed it in the contract").

Based on the clear language of Rickmers's bill of lading, Coastal should benefit from the COGSA limitation contained therein. The bill of lading specifically extends COGSA's limitations to pre-loading conduct, so long as goods are in the custody of Rickmers's "Agent." For purposes of the bill of lading, "Agent" includes stevedores. The parties do not dispute that Coastal was Rickmers's exclusive stevedore in New Orleans; nor do they dispute that the boiler was in Coastal's custody prior to loading it on the vessel. Therefore, Coastal qualifies for COGSA's limitation on liability per the unambiguous terms of Rickmers's bill of lading.

## C

Plaintiffs also argue that the COGSA extension does not apply because Rafinasi was not aware of the bill of lading's terms. They claim that there is no evidence that the bill of lading proffered as evidence is the one that Rickmers was using at the time and that the law requires the shipper's affirmative knowledge of a bill of lading's terms. The district court did not reach these claims since it determined that Coastal's conduct did not fall within the auspices of the bill of lading. For the reasons that follow, we reject Plaintiffs' claims.

Plaintiffs' first argument is that there is no evidence demonstrating that the bill of lading offered as evidence is the bill of lading that Rickmers would have in fact issued had the boiler been successfully loaded on the vessel. This argument is somewhat problematic insofar as Plaintiffs want Coastal to prove a negative by affirmatively showing that no other bill of lading would have issued had the boiler been loaded without incident. It is not clear how Coastal would carry such a burden. By submitting a copy of Rickmers's bill of lading, it

would appear that Coastal has made a *prima facie* showing and that, absent specific evidence to the contrary, Plaintiffs' claim lacks merit. Moreover, Plaintiffs had the option to view Rickmers's bill of lading prior to the failed loading incident. They concede that the booking note and dock receipt explicitly incorporate the bill of lading. Since the booking note states that "[t]he terms [of the bill of lading] are available on request," Plaintiffs cannot now claim ignorance as to the bill of lading applicable at that time. Therefore, we reject Plaintiffs' claim that the bill of lading proffered may not be identical to the version applicable when the boiler was damaged.[5]

We also reject Plaintiffs' second assertion, that Rafinasi lacked affirmative knowledge of the unissued bill of lading's terms, because this position is foreclosed by precedent. Case law in the Fifth Circuit demonstrates that an unissued bill of lading nevertheless binds the parties. In *Baker Oil Tools, Inc. v. Delta S.S. Lines, Inc.*, 562 F.2d 938 (5th Cir. 1977), the court stated that parties to a shipping arrangement were bound by the terms of the bill of lading, even though the bill of lading was never actually issued. 562 F.2d at 940. In *Baker Oil*, the bill of lading's terms were abrogated only to the extent that the defendant, Delta Steamship Lines, had unilaterally cancelled a part of the parties' agreement. *Id.*

---

[5] Plaintiffs rely heavily on *Scott & Williams, Inc. v. Pittston Stevedoring Corp.*, 422 F. Supp. 40 (S.D.N.Y. 1976), to claim that stevedores face a high evidentiary burden when proffering bills of lading incorporated into other documents. However, *Scott & Williams* is not binding as precedent and is also readily distinguishable since the court there was faced with a situation where more than one version of the bill of lading had been used, and in fact, a new bill of lading was introduced into use at some point during the transaction giving rise to the parties' dispute. 422 F. Supp. at 42. No such evidence has been put forth here, and Plaintiffs have not offered evidence suggesting that more than one version of the bill of lading was being used around the time the boiler was being shipped. Instead, absent evidence to the contrary, it seems that Rickmers had only a single version of the bill of lading in use at the time and that the bill of lading in the record is the correct version.

The court also found that the parties were bound by the terms of an unissued bill of lading in *Luckenbach S.S. Co. v. Am. Mills Co.*, 24 F.2d 704 (5th Cir. 1928), because the shipper was "presumed to know the law, and therefore must have known that the terms and conditions on which its goods were received and would be transported would be contained in a bill of lading to be issued later." 24 F.2d at 705. On this basis alone, Fifth Circuit precedent clearly establishes that parties to a shipping arrangement are bound by the terms of a bill of lading, even if circumstances intervene, preventing the bill of lading from issuing. District courts in the Fifth Circuit, relying on this precedent, have held similarly. *See, e.g.*, *Noble Drilling, Inc. v. M/V OSC VLISTDIEP*, No. 10–2865, 2011 WL 1399243, at *6 (E.D. La. Apr. 12, 2011) ("At rock bottom, there is Fifth Circuit jurisprudence which clearly holds that a bill of lading is not required for a meeting of the minds to have occurred between a cargo owner (shipper), and a vessel owner (carrier) and that *even provisions of an unissued bill of lading* can be contractually enforced when the shipper's goods are damaged after the carrier has taken possession of them."); *Am. Augers, Inc. v. M/V Cal. Jupiter*, No. H-07-1904, 2007 WL 4260926, at *1 (S.D. Tex. Dec. 3, 2007) ("Under Fifth Circuit precedent, the terms of an unissued bill of lading are binding where the cargo was damaged prior to issuance."). Therefore, we reject Plaintiffs' claim that their ignorance of the bill of lading's terms precludes its effect.

## IV

For the foregoing reasons, we REVERSE the district court's judgment and REMAND for further proceedings consistent with this opinion.