OWEN, Circuit Judge,
dissenting:
Our court has considered this case en banc in an effort to bring at least some uniformity and predictability to the law in this Circuit regarding the applicability of the Outer Continental Shelf Lands Act (OCSLA)[1] to contractual indemnity provi *802 sions. That is a laudable and responsible undertaking, given the confusion in our jurisprudence in this area. I respectfully submit, however, that the test the court adopts today sweeps too broadly. Nor does the “majority-of-the-work” test find support in the express provisions of OCS-LA, state law applied as federal law, or federal common law.
This case presents a difficult question: what law governs an indemnity provision in a contract when the act or omission that gave rise to the underlying tort claim occurred on navigable water on the Outer Continental Shelf (OCS), but the indemnity obligation is contained in a contract that primarily calls for work to be performed on stationary platforms on the OCS, although it also contemplates activities on navigable waters? It is not clear from OCSLA, at least to me, what law Congress intended to govern contractual obligations under these circumstances. A number of arguments can be made, as will be considered below, regarding the correct tack to take.
The court has today fashioned a choice-of-law mechanism that turns on where the majority of the work is to be performed. While I agree that choice-of-law principles must apply under OCSLA with regard to contracts to which more than one body of substantive law might apply, I would apply either federal common law choice-of-law principles or Louisiana’s choice-of-law code provisions. The Supreme Court asked and left unanswered questions in Gulf Offshore Co. v. Mobil Oil Corp.[2] as to whether federal common law or a state’s law should be applied as federal law under OCSLA if there is a conflict between the federal law and state law. Because the parties have not addressed the issues that pertain to such an analysis, I would remand to the district court for further proceedings.
I
The facts in this case are somewhat complicated because several contracts are involved, and Seacor is seeking indemnity from Grand Isle pursuant to a provision in a contract between Grand Isle and BP American Production Company. Seacor is not a party to that contract but is an express third-party beneficiary.
Grand Isle agreed with BP to indemnify each of BP’s other contractors, such as Seacor, from claims made by Grand Isle employees if the contractor seeking indemnity had executed an agreement with BP extending reciprocal indemnity to Grand Isle. The master service agreement between Grand Isle and BP, in which the indemnity provision at issue is found, provides that BP contractors are third-party beneficiaries of this indemnity agreement. Similar indemnity provisions are contained in Seacor’s Vessel Charter Contract with BP.
The BP/Grand Isle agreement contemplates that Grand Isle employees will perform work on fixed platforms in the Gulf of Mexico, but it also expressly provides that BP will furnish transportation for Grand Isle employees from the shore to the platforms[3] and room and board offshore.[4] Accordingly, the BP/Grand Isle contract ac *803 knowledges that activities undertaken in furtherance of the contract will occur both on navigable waters as well as on the offshore platforms. A Grand Isle employee was injured on Seacor’s vessel while in transit between an offshore platform used for living quarters and the offshore platform on which he had been working. The employee recovered from Seacor, and Sea-cor seeks indemnity from Grand Isle.
While third-party beneficiary indemnity agreements may not obtain in every or even most agreements pertaining to work on offshore platforms on the OCS, it would seem that many OCS-related contracts will contemplate that activities undertaken in furtherance of the contract will occur not only on offshore platforms, but on or over navigable waters because the workers will necessarily have to traverse the OCS to reach offshore platforms. There are at least two bodies of law that could arguably apply to indemnity provisions in such contracts: general maritime law[5] or the law of the adjacent state applied as federal law. It is also possible that a contract could call for work on multiple platforms, some of which are offshore one state and others offshore another. This increases the potential sources of law that might be applied to indemnity provisions. The court’s decision today reaches all such contracts.
It is also conceivable that a single contract could provide for work onshore, in states that are not adjacent to the OCS, as well as work on the OCS. The court’s decision appears to reach contracts in which only a small percentage of the work to be performed occurs offshore.
Another notable result of the court’s test is that it gives no effect to contractual choice-of-law provisions. The majority-of-the-work test is the only factor to be considered if the contract is not a maritime contract and applicable state law is not inconsistent with federal law.
In the present case, the master service agreement between BP and Grand Isle provides that
whenever performance of this contract is in any way related to maritime activity, the general maritime laws of the United States shall govern the validity, construction, interpretation, and effect of this contract, excluding any choice of the law rules which would otherwise require the application of laws of any other jurisdiction.
Grand Isle and BP agreed that
[i]n the event maritime law is held to be inapplicable by a court of competent jurisdiction, the laws of the state of Oklahoma shall apply, unless (i) otherwise provided in this contract or (ii) application of such law to a particular provision would prevent enforcement of such provision, in which case the law applicable to such provision shall be any potentially applicable law that would allow enforcement of said provision as written.
The majority-of-the-work test means that choice-of-law provisions will be ignored in a contract that covers activities in more than one area of the OCS as well as related activities on the high seas. For example, a contract may encompass work on a platform offshore Louisiana and work on another platform offshore Texas, and the parties may specify that Texas law will govern all issues. Applying the court’s test, if a majority, even a slim majority, of the work is to be performed in Louisiana, then Louisiana law will govern all aspects *804 of the contract as federal law. An injury to a worker that occurred on a platform offshore Texas may give rise to a contractual claim for indemnity, but the indemnity claim will be governed by substantive Louisiana law as federal law even though (1) the parties agreed Texas law would apply, (2) the injury occurred in an area offshore Texas and Texas law will govern any personal injury claims as federal law, and (3) Louisiana state courts applying Louisiana law might not give effect to the Louisiana Offshore Indemnity Act (or LOLA)[6] under similar facts that did not concern the OCS.[7] Outside the indemnity area, routine breach-of-contract issues, such as whether a breach occurred, whether the breach was material, and the types of damages available, would be governed by Louisiana law as federal law even though the parties agreed that Texas law would apply to the contract and substantial work occurred offshore Texas.
The majority-of-the-work test appears to apply to all contractual obligations, even though generally accepted choice-of-law principles recognize that differing law may apply to differing provisions of a contract.[8] The majority-of-the-work test selects the substantive law of a single state (excluding choice-of-law principles) to serve as borrowed federal law for all contractual issues.
The court does not explain how the majority-of-the-work test will affect contractual claims that relate to property. Will contractual rights and substantive law regarding structures or pipelines attached to the seabed on the OCS be governed by one state’s law even though the structures or pipelines are found across a broad expanse of the OCS, some in areas adjacent to Texas, others in areas adjacent to Louisiana, Mississippi, or Alabama?
The proper application of OCSLA presents difficult questions, but I submit that Congress, in enacting OCSLA, did not intend to jettison well-recognized principles *805 that determine what law will govern particular contractual provisions. Congress’s goal in enacting OCSLA was to “provide a comprehensive and familiar body of law.”[9]
II
The starting point in determining what OCSLA requires is the Act itself. Section 1333(a)(1) provides that:
The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State ....[10]
As the Supreme Court has stated, “OCS-LA declares the Outer Continental Shelf to be an area of exclusive federal jurisdiction.”[11] OCSLA further provides that
[t]o the extent that they are applicable and not inconsistent with this subchap-ter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf ... ,[12]
It is this provision of OCSLA that directs courts to apply federal law to the subsoil and seabed of, and artificial islands and fixed structures on, the OCS, but to borrow “applicable and not inconsistent” state law. OCSLA does not expressly mention contracts that pertain to such artificial islands and structures.
There are a number of possible interpretations of OCSLA’s applicability to contracts. The first question that must be answered is whether Congress intended the extended geographic boundaries of adjacent states to determine what law applies to any contractual provision touching a structure within a particular state’s extended boundaries, without regard to choice-of-law principles. Notably, the court’s opinion does not conclude that geographic boundaries are determinative. Under the majority-of-the-work test, a single state’s law will be selected even if the contract pertains to work in more than one state’s adjacent area. The court has employed a choice-of-law test, but not one derived from “the normal choice-of-law rules that the forum would apply.”[13]
However, if the geographic boundary is determinative, then the question remains, do courts look to the geographic location of the underlying occurrence that gives rise *806 to the contractual dispute, or should the contract’s relationship to a geographic area be considered instead? If the contract is considered, there are numerous possibilities, from a geographic perspective. Should courts look to the area in which the contract contemplates that some, a substantial amount, or a majority of the work has been performed? Alternatively, should the question be where the work will be performed over the life of the contract? Should courts instead consider the location of the work the injured party had been performing or was about to perform? Should we look to which fixed structure the worker was en route in furtherance of the contract, or leaving, when injured? Judge Garza’s dissenting opinion concludes that the geographic location of the underlying injury giving rise to the contractual dispute is determinative. This test is appealing because it is easily applied. I am not persuaded, however, that the text of OCSLA supports it.
The concept that we consider only geography and not choice-of-law principles when the OCS is involved is derived directly from decisions of the Supreme Court. The Court has construed OCSLA and said in Chevron Oil Co. v. Huson that “[sjince the federal court is not, then, applying the law of another forum in the usual sense, ordinary conflict of laws principles have no relevance.”[14] The Supreme Court subsequently cited this statement in' support of its conclusion in a footnote in Gulf Offshore Co. v. Mobil Oil Corp. that “OCSLA does supersede the normal choice-of-law rules that the forum would apply.”[15]
The Court’s statements regarding choice of law must be considered in context. Both cases involved primarily tort (personal injury) actions.[16] The Court was not called upon to consider whether choice-of-law principles have “no relevance” in contract actions.
The Supreme Court’s actual holding in Chevron Oil Co. v. Huson was that Louisiana’s statute of limitations governed an injured worker’s suit for personal injuries.[17] State law was applied as federal law, and accordingly, the Court reasoned that “[sjince the federal court is not, then, applying the law of another forum in the usual sense, ordinary conflict of laws principles have no relevance. [The Louisiana statute of limitations] is ‘applicable’ in federal court under the Lands Act just as it would be applicable in a Louisiana court.”[18] This is far from an all-encompassing rejection of choice-of-law principles that pertain to contracts.
In Gulf Offshore Co. v. Mobil Oil Corp., Mobil had sued Gulf for contractual indemnity after a Gulf employee was injured on a vessel chartered by Mobil.[19] The question actually decided in that case was whether federal courts have exclusive jurisdiction over personal injury and indemnity claims arising under OCSLA.[20] The injury occurred offshore Louisiana, and there was no argument before the Court that another adjacent state’s law applied or that general maritime law applied either to the personal injury claim or the contractual indemnity provision. The Supreme *807 Court simply observed that Louisiana law applied as federal law under OCSLA to the personal injury action.[21] Indeed, there was only scant mention of the contractual indemnity provision. Nor was any contention made in Gulf Offshore that the indemnity provision was unenforceable under Louisiana’s Oilfield Indemnity Act, because the injury in that case occurred in 1975, before the Louisiana law was enacted in 1981.[22] The Supreme Court did not hold that courts are foreclosed from applying an adjacent state’s choice-of-law principles when the adjacent state would consult its choice-of-law rules in deciding whether a statutory provision should be applied to render a contractual indemnity provision unenforceable.
It is unquestionably our obligation to apply the Supreme Court’s precedent faithfully. That does not mean that we should unquestioningly assume that the Court’s statements in one context are binding precedent in other, demonstrably different, contexts. I respectfully submit that we should not consider the Supreme Court’s conclusion that choice-of-law principles do not apply to tort actions as a binding determination that resort cannot be had to choice-of-law principles in order to determine what substantive law governs a contract. In other areas of the law, the Supreme Court has recognized that different concepts apply in deciding what law governs a contract as distinguished from a tort.[23] For example, the Supreme Court has said that in determining whether a contract is a maritime contract, “[t]he boundaries of admiralty jurisdiction over contracts — -as opposed to torts or crimes— being conceptual rather than spatial, have always been difficult to draw.”[24] The Court explained, “To ascertain whether a contract is a maritime one, we cannot look to whether a ship or other vessel was involved in the dispute, as we would in a putative maritime tort case.”[25] “Nor can we simply look to the place of the contract’s formation or performance.”[26] In discussing the seminal decision of Kossick v. United Fruit Co.,[27] the Court said, “It did not matter that the site of the inadequate treatment — which gave rise to the contract dispute — was in a hospital on land.”[28] Rather, whether the contract was a maritime contract turned on considerations divorced from the location of the treatment that the shipowner promised to provide to the injured seaman.[29]
It would seem that some choice-of-law rules must be applied to determine wheth *808 er a contract is governed by OCSLA and if so, which adjacent state’s law is borrowed as federal law, to the extent it is not in conflict with federal law.
Ill
If Congress did not intend in OCSLA to foreclose consultation of choice-of-law principles that apply to contracts, then the next question that must be answered is what choice-of-law principles should govern. The possible choices include federal common law choice-of-law principles applicable to contracts, the application of the “adjacent state’s” choice-of-law principles, or the application of the forum state’s choice-of-law principles.
The Supreme Court has left open whether state law applied as federal law under OCSLA or federal common law prevails when the result would differ depending on which body of law applied. In Gulf Offshore Co. v. Mobil Oil Corp., one issue was whether, in an OCSLA case, the jury must be instructed that damages for lost future wages are not subject to federal income taxation.[30] The Court explained that “[o]ur first task is to determine the source of law that will govern.”[31] To do so, “a court must consider the content of both potentially applicable federal and state law.”[32] The Court observed that under federal common law, a defendant was entitled to such an instruction in an Federal Employers’ Liability Act case.[33] The Court concluded that “[i]f Congress had been silent about the source of federal law in an OCSLA personal injury case, Liepelt would require that the instruction be given.”[34] “But Congress was not silent,” the Court noted,[35] and it remanded the case to state court “for a determination of whether Louisiana law requires the instruction and, if it does not, whether Liepelt displaces the state rule in an OCSLA case.”[36] Its reasoning for doing so was as follows:
[Congress] incorporated for this case the applicable law of Louisiana, but only “[t]o the extent [it is] not inconsistent” with federal law. The statute does not distinguish between federal statutory and judge-made law. It would seem then that if Louisiana law is “inconsistent,” Liepelt controls. Doubt arises, however, because in OCSLA Congress borrowed a remedy provided by state law and thereby “specifically rejected national uniformity” as a paramount goal. Chevron Oil v. Huson, 404 U.S., at 104, 92 S.Ct., at 354. In Chevron, we held that Louisiana rather than federal common law provided the federal statute of limitations for personal injury damages actions under OCSLA. We recognized that “Congress made clear provision for filling the ‘gaps’ in federal law; it did not intend that federal courts fill those ‘gaps’ themselves by creating new federal common law.” Id., at 104-105, 92 S.Ct., at 354. In this case, we face an analogous question: does the incorporation of state law preclude a court from finding that state law is “inconsistent” *809 with a federal common-law rule generally applicable to federal damages actions?
We need answer this question only if Louisiana law would not require that the instruction be given upon timely request.[37]
It would therefore seem necessary to determine if there is federal common law generally applicable to determine what law governs contracts. If so, is that law inconsistent with Louisiana law, and if there is a conflict, does federal common law displace Louisiana law in an OCSLA case? In this regard, I note only that circuit courts have concluded that a federal common law choice-of-law analysis should be conducted when the issue is a federal question,[38] and that in the absence of guidance from Congress, courts have relied upon the Restatement (Second) of Conflicts of the Law for the content of federal common law.[39]
In the present case, Louisiana is unquestionably the adjacent state. But in other fact patterns, determining the “adjacent state” for purposes of deciding what law governs a contractual provision presents many of the same conundrums faced when attempting to apply geographic boundaries.
With regard to Louisiana law, at least one relatively recent intermediate appellate court decision indicates that Louisiana courts would first consult applicable choice-of-law Louisiana code provisions before deciding if Louisiana’s Oilfield Indemnity Act eviscerates a contractual indemnity agreement. In King v. I.E. Miller of Eunice, Inc., Grey Wolf, a corporation domiciled in Texas, and I.E. Miller, a corporation domiciled in Louisiana, entered into a master service agreement that contained reciprocal indemnity provisions and provided that Texas law would apply to any issue arising under the contract.[40] The agreement contemplated work in four states, including Texas and Louisiana.[41] A verbal work order was issued by Grey Wolf for work to be performed in Louisiana, and its employee, a Louisiana resident, was injured in the course of that work[42] due to I.E. Miller’s negligence.[43] The Louisiana corporation (I.E. Miller) sought indemnity from the Texas corporation (Grey Wolf). The Louisiana court held that Texas law applied and refused to void the indemnity agreement under Louisiana’s Oilfield Indemnity Act.[44] In reaching that decision, the Louisiana court first applied choice-of-law provisions contained *810 in LouisiaNA Civil Code articles 3540,[45] 3537,[46] 3515,[47] and comment (b) to article 3515.[48] Slightly more than half (51.78%) of the work under the master service agreement was performed in Texas, approximately 30% was performed in Louisiana, and approximately 17% was performed in both Texas and Louisiana,[49] although the appellate court did “not give much weight to this information.”[50] The court concluded “that the relationship of Louisiana is stronger to each party than the relationship of Texas to each party,”[51] but the court applied Texas law because the parties “would justifiably expect to be subjected to the law of Texas and would suffer minimal adverse consequences if subjected to that state’s law”[52] and because “Texas’ policy of upholding contracts which are freely and voluntarily entered into far outweighs Louisiana’s policy of protecting oilfield subcontractors.”[53] The court also candidly expressed its parochial concerns, explaining that Louisiana’s oilfield indemnity law was designed to protect Louisiana subcontractors, and if enforced in this case, the law would prohibit a Louisiana corporation from obtaining indemnity from a Texas corporation.[54] The court held that because Texas law would apply under the parties’ choice-of-law provision as well as in the absence of that provision, the trial *811 court erred in voiding the mutual indemnity provision.[55]
This court has applied Louisiana’s choice-of-law code provisions as the initial step in determining whether the Louisiana Oilfield Indemnity Act applied to render unenforceable indemnity provisions at issue in a diversity case in which the injury-had occurred in Louisiana state waters.[56] After a lengthy analysis of the factors set forth in Louisiana’s civil code provisions regarding choice of law, we concluded that Louisiana law would govern in the absence of the choice-of-law provision,[57] and that application of Texas law under the choice-of-law provision would violate Louisiana public policy as expressed in the Oilfield Indemnity Act.[58] We consequently refused to enforce the indemnity provision.[59]
Because our existing precedent does not consider choice-of-law principles in a case in which OCSLA may apply, the parties have not briefed the questions that arise. I would remand to allow the parties and the district court to consider further what law governs the indemnity provisions at issue.
IV
The court’s majority-of-the-work test is relatively easy to apply and provides a measure of predictability. These are commendable attributes. However, the court’s opinion implicitly crafts a new federal common law choice-of-law rule to decide what law will govern a contract that has some connection with structures on or attached to the seabed of the OCS or with the seabed itself. The Supreme Court has admonished that “Congress made clear provision for filling in the ‘gaps’ in federal law” that is to be applied under OCSLA, and that Congress “did not intend that federal courts fill in those ‘gaps’ themselves by creating new federal common law.”[60] We are to apply the adjacent state’s law as federal law,[61] to the extent that it is not inconsistent with federal law.[62] I know of no “majority-of-the-work” test under federal law, even if federal common law that is inconsistent with Louisiana state law takes precedence under OCS-LA.[63]
*812 sfc ^ :¡: * %
For the foregoing reasons, I respectfully dissent.

. 43 U.S.C. §§ 1331 et seq.

. 453 U.S. 473, 487-88, 101 S.Ct. 2870, 69 L.Ed.2d 784 (1981).

. Article 2.04 provides: "Unless otherwise agreed in writing, Company [BP] shall furnish, at its cost and expense, transportation for Contractor's [Grand Isle’s] personnel, equipment, and materials between Company’s [BP's] designated shorebase or heliport and the offshore Work location.”

.Article 2.06 provides: "Company [BP] shall provide room and board at the offshore Work location for Contractor’s [Grand Isle’s] personnel performing services under this Contract.”

. See Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 218-19, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986) (holding that admiralty jurisdiction was properly invoked in a suit by survivors of offshore workers who perished in a helicopter crash while being transported from an offshore platform to shore).

. La.Rev.Stat. Ann. § 9:2780(A).

. See, e. g., King v. I.E. Miller of Eunice, Inc., 07-167, p. 6 (La.App. 3 Cir. 11/21/07); 970 So.2d 703, 707.

. See Restatement (Second) of Conflict of Laws § 188 cmt. d ("Each issue is to receive separate consideration if it is one which would be resolved differently under the local law rule of two or more of the potentially interested states.”); see also La. Civ.Code Ann. art. 3515 cmt. d, which provides:
(d) Issue-by-issue analysis and dépegage. The use of the term "issue” in the first paragraph of this Article is intended to focus the choice-of-law-process on the particular issue as to which there exists an actual conflict of laws. When a conflict exists with regard to only one issue, the court should focus on the factual contacts and policies that are pertinent to that issue. When a conflict exists with regard to more than one issue, each issue should be analyzed separately, since each may implicate different states, or may bring into play different policies of these states. Seen from another angle, each state having factual contacts with a given multi-state case may not have an equally strong interest in regulating all issues in the case, but only those issues that actually implicate its policies in a significant way.
This so-called issue-by-issue analysis is an integral feature of all modern American choice-of-law methodologies and facilitates a more nuanced and individualized resolution of conflicts problems. One result of this analysis might be that the laws of different states may be applied to different issues in the same dispute. This phenomenon is known in conflicts literature by its French name of dépeqage. Although infrequently referred to by this name, this phenomenon is now a common occurrence in the United States and has received official recognition in Europe. This Article does not prohibit dépeqage. However, dépegage should not be pursued for its own sake. The unnecessary splitting of the case should be avoided, especially when it results in distorting the policies of the involved states.

. Chevron Oil Co. v. Huson, 404 U.S. 97, 103, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), overruled in part on other grounds by Harper v. Va. Dep’t of Taxation, 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993).

. 43 U.S.C. § 1333(a)(1).

. Gulf Offshore Co. v. Mobil Oil Corp., 453 U.S. 473, 479, 101 S.Ct. 2870, 69 L.Ed.2d 784 (1981) (internal quotation marks omitted).

. 43 U.S.C. § 1333(a)(2)(A).

. Gulf Offshore Co., 453 U.S. at 482 n. 8, 101 S.Ct. 2870.

. 404 U.S. at 102-03, 92 S.Ct. 349.

. 453 U.S. at 482 n. 8, 101 S.Ct. 2870; see also id. at 486, 101 S.Ct. 2870 (“The statute thus contains an explicit choice-of-law provision.”).

. See id. at 480-85, 101 S.Ct. 2870; Chevron Oil Co., 404 U.S. at 98, 92 S.Ct. 349.

. 404 U.S. at 102-03, 92 S.Ct. 349.

. Id.

. 453 U.S. at 476 & n. 1, 101 S.Ct. 2870.

. Id. at 475, 101 S.Ct. 2870.

. Id. at 481, 101 S.Ct. 2870. The Supreme Court subsequently noted in Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 219, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986), that "no question was even raised in Gulf Offshore regarding whether OCSLA applied to an accident aboard a vessel adjacent to the platform." See also id. at 219, 106 S.Ct. 2485 ("[T]he facts of [Gulf Offshore and Rodrigue v. Aetna Casualty & Surety Co., 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969)] make clear that OCSLA was presumed applicable not because of the status of the decedents but because of the proximity of the workers' accidents to the platforms and the fact that the fatalities were intimately connected with the decedents' work on the platforms.”).

. 1981 La. Acts, No. 427.

. Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 23, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004).

. Id. (internal citation and quotation marks omitted).

. Id.

. Id. at 24, 125 S.Ct. 385.

. 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961).

. Norfolk S. Ry. Co., 543 U.S. at 25, 125 S.Ct. 385.

. See id. at 24-25, 125 S.Ct. 385.

. 453 U.S. 473, 485, 101 S.Ct. 2870, 69 L.Ed.2d 784 (1981).

. Id.

. Id. at 486, 101 S.Ct. 2870.

. Id. (citing Norfolk & W. Ry. Co. v. Liepelt, 444 U.S. 490, 498, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980)).

. Id. at 487, 101 S.Ct. 2870.

. Id.

. Id. at 488, 101 S.Ct. 2870.

. Id. at 487-88, 101 S.Ct. 2870.

. See Gluck v. Unisys Corp., 960 F.2d 1168, 1179 n. 8 (3d Cir.1992); Edelmann v. Chase Manhattan Bank, N.A., 861 F.2d 1291, 1294-95 (1st Cir.1988); Corporación Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786, 795 (2d Cir.1980) ("This is a federal question case ... and it is appropriate that we apply a federal common law choice of law rule ....").

. See Eli Lilly Do Brasil, Ltda. v. Fed. Express Corp., 502 F.3d 78, 81 (2d Cir.2007) ("[W]hen conducting a federal common law choice-of-law analysis, absent guidance from Congress, we may consult the Restatement (Second) of Conflict of Laws.”); Huynh v. Chase Manhattan Bank, 465 F.3d 992, 997 (9th Cir.2006) ("Federal common law follows the approach outlined in the Restatement (Second) of Conflict of Laws.”); Chan v. Soc'y Expeditions, Inc., 123 F.3d 1287, 1297 (9th Cir.1997) ("Federal common law applies to choice-of-law determinations in cases based on ... admiralty .... Federal common law follows the approach of the Restatement (Second) of Conflicts of Laws.”).

. 07-167, p. 1 (La.App. 3 Cir. 11/21/07); 970 So.2d 703, 704.

. Id. at 706.

. Id.

. Id. at 704.

. Id. at 707.

. That provision states: “All other issues of conventional obligations are governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537.”

. Article 3537 provides:
Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, 1ype, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

. Article 3515 provides:
Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

. Comment (b) to Article 3515 provides:
The objective is to identify "the state whose policies would be most seriously impaired if its law were not applied to that [particular] issue”, that is, the state which, in light of its relationship to the parties and the dispute and its policies rendered pertinent by that relationship, would bear the most serious legal, social, economic, and other consequences if its law were not applied to that issue.

. King, 970 So.2d at 706.

. Id. at 706 n. 2.

. Id. at 706.

. Id. at 706-07

. Id. at 707.

. Id.

. Id.

. See Roberts v. Energy Dev. Corp., 235 F.3d 935 (5th Cir.2000).

. Id. at 943.

. Id.

. Id. at 944.

. Chevron Oil Co. v. Huson, 404 U.S. 97, 104-05, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), overruled in part on other grounds by Harper v. Va. Dep't of Taxation, 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993).

. Id. at 103, 92 S.Ct. 349 ("The policies underlying the federal absorption of state law in the Lands Act make this result particularly obvious. As we pointed out in Rodrigue, Congress recognized that ‘the Federal Code was never designed to be a complete body of law in and of itself' and thus that a comprehensive body of state law was needed.”); id. at 104 ("[T]he Court of Appeals’ approach [applying the laches doctrine through admiralty law] amounts to an inappropriate creation of federal common law.”); cf. id. ("Congress specifically rejected national uniformity and specifically provided for the application of state remedies which demand state, not federal, statutes of limitation.”).

. Gulf Offshore Co. v. Mobil Oil Corp., 453 U.S. 473, 487, 101 S.Ct. 2870, 69 L.Ed.2d 784 (1981).

. See id. ("But Congress was not silent. It incorporated for this case the applicable law of Louisiana, but only '[t]o the extent [it is] not inconsistent with federal law.’ The statute does not distinguish between federal statutory and judge-made law. It would seem then that if Louisiana law is ‘inconsistent,’ [federal common law] controls. Doubt arises, however, because in OCSLA Congress bor *812 rowed a remedy provided by state law and thereby 'specifically rejected national uniformity’ as a paramount goal.”).