# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PROSHIPLINE INC; EP-TEAM INC.,
　　　　　　*Plaintiffs-Appellants,*

　　　　　　v.

ASPEN INFRASTRUCTURES LTD,
formerly known as Suzlon
Infrastructure Ltd; SUZLON
INFRASTURCTURE LTD,
　　　　　　*Defendants-Appellees.*

No. 08-35337

D.C. No.
3:07-cv-05660-FDB

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Western District of Washington
Franklin D. Burgess, District Judge, Presiding

Argued and Submitted
December 7, 2009—Seattle, Washington

Filed February 3, 2010;
Amended June 8, 2010

Before: Robert R. Beezer, Ronald M. Gould and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Beezer;
Partial Concurrence and Partial Dissent by Judge Tallman

8247

## COUNSEL

Steven V. Gibbons, Gibbons & Associates, P.S., Seattle, Washington, for the plaintiffs-appellants.

Robert J. Bocko, Keesal, Young & Logan, Seattle, Washington, for the defendant-appellee.

**ORDER**

The opinion filed February 3, 2010 is hereby amended. The amended opinion is filed concurrently with this order.

The petition for rehearing filed by Defendants-Appellees on February 16, 2010 is **DENIED**. The petition for rehearing filed by Plaintiffs-Appellants on February 17, 2010 is also **DENIED**.

Absent further order of the court, no further petitions for rehearing or rehearing en banc will be considered.

---

**OPINION**

BEEZER, Circuit Judge:

Plaintiffs-appellants ProShipLine, Inc. and EP-Team, Inc. appeal from two district court decisions in favor of defendant-appellee Aspen Infrastructures Ltd. Both decisions involve a writ of maritime attachment that ProShipLine and EP-Team obtained against Aspen pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims to the Federal Rules of Civil Procedure ("Rule B"). The district court held in the first decision that it could not compel Aspen to post security in lieu of garnishment. This decision forced ProShipLine and EP-Team to either waive their right to garnish Aspen's property pursuant to a previously obtained Rule B writ or to garnish the property despite alleged impracticability. The district court, in the second decision, equitably vacated ProShipLine's and EP-Team's Rule B writ and exonerated security posted for that writ. The district court further ordered ProShipLine and EP-Team to reimburse Aspen for the value of the property they seized in accord with that writ.

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. We hold that although the district court's first deci-

sion was proper, the district court abused its discretion in the second decision. Equitable vacatur should not have been applied against EP-Team individually.

# I

The litigants' legal relationship formally began on April 9, 2006, when EP-Team[1] and Aspen[2] entered into the Sales and Logistics Services Agreement. Under the Agreement, ProShipLine,[3] as EP-Team's designated agent and assignee, agreed to act as Aspen's general sales and port services agent. ProShipLine and EP-Team solicited cargo for return trips to India and handled port and terminal operations for Aspen throughout America.[4]

The parties' Agreement contains a forum selection clause that says that, in the case of a dispute between the parties, arbitration should take place in Singapore. The Agreement also includes a choice-of-law clause providing that, in such a dispute, the Agreement should be construed and enforced in accord with English law. ProShipLine's, EP-Team's and

[1]EP-Team is a Delaware corporation with its principal place of business in Flower Mound, Texas. EP-Team is a consulting and management enterprise that works with companies across a variety of business sectors.

[2]At the time of contracting, Aspen, a closely-held enterprise incorporated in India, did business under the name of Suzlon Infrastructure Ltd. Over the past several years, Suzlon Infrastructure Ltd. changed its name to Aspen Infrastructures Ltd., had its name revert back to Suzlon Infrastructure Ltd. and changed its name again to Synefra Engineering & Construction Ltd. In the interest of simplicity, we refer to this enterprise as "Aspen" regardless of its actual name at different points in time.

[3]ProShipLine is a Nevada corporation with its principal place of business in Houston, Texas. ProShipLine serves as a contract carrier for various types of cargo.

[4]Aspen charters vessels to transport wind turbine generator components from India to other countries, including the United States. In an effort to avoid vessels returning to India empty handed, Aspen entered the contract carriage business to obtain cargo for its return trips to India.

Aspen's contractual relationship remained in good standing for more than a year.

ProShipLine's, EP-Team's and Aspen's relationship became strained in the summer of 2007. Each side blames the other for breaching the Agreement.[5] We do not examine the merit of these contentions. We observe only that the conflict resulted in the parties terminating their business relationship on or about August 1, 2007. The end of the business relationship marked the onset of extensive litigation in Texas, New York and Washington.

## A

On August 6, 2007, ProShipLine and EP-Team filed suit against Aspen in the Southern District of Texas. *EP-Team, Inc. v. Aspen Infrastructure, Ltd.*, No. 4:07 Civ. 2549 (S.D. Tex. Aug. 8, 2007). ProShipLine and EP-Team sought declaratory relief regarding the construction and enforcement of the Agreement and to compel arbitration. Aspen then moved to stay the case pending resolution of the parties' disputes through arbitration in Singapore. On December 5, 2007, the Texas District Court granted Aspen's motion and administratively closed the suit. The court expressly left open the option to reinstate the case following the conclusion of the arbitration proceedings.

On December 7, 2007, ProShipLine and EP-Team initiated a second action against Aspen in the Southern District of Texas. *ProShipLine, Inc. v. M/V Beluga Revolution*, No. H-07-4170, 2007 WL 5397377, at *1 (S.D. Tex. Dec. 7, 2007).

---

[5]ProShipLine and EP-Team allege that Aspen sought to involve them in multiple transactions that ProShipLine and EP-Team believed were illegal. Aspen alleges that it had grown dissatisfied with ProShipLine's and EP-Team's performance, especially regarding bookkeeping and the handling of a bank account operated by ProShipLine and EP-Team on behalf of Aspen.

In that action, ProShipLine and EP-Team sought an order and writ of maritime attachment pursuant to Rule B. The district court issued the writ on December 10, 2007. Aspen immediately moved to vacate the writ. After conducting an evidentiary hearing on December 14, 2007, the district court granted Aspen's motion and vacated the writ.[6] *ProShipLine, Inc. v. M/V Beluga Revolution*, No. H-07-4170, 2007 WL 4481101, at *1 (S.D. Tex. Dec. 18, 2007).

## B

Similar legal proceedings took place in New York. On October 12, 2007, Aspen brought suit against EP-Team individually in the Southern District of New York (the "First New York Action"). *Aspen Infrastructures, Ltd. v. E.P. Team, Inc.*, No. 07 Civ. 8813 (RWS), 2008 WL 2963491 (S.D.N.Y. Aug. 1, 2008). Aspen alleged admiralty jurisdiction and sought an order and writ of maritime attachment pursuant to Rule B. The district court ordered the issuance of the writ, and, pursuant to that writ, Aspen seized funds belonging to EP-Team. Aspen's victory was only temporary, however, as EP-Team successfully moved to vacate the writ.[7]

On December 3, 2007, ProShipLine independently filed a separate action against Aspen in the Southern District of New York (the "Second New York Action"). *ProShipLine, Inc. v. Aspen Infrastructures, Ltd.*, 533 F. Supp. 2d 422, 425 (S.D.N.Y. 2008). ProShipLine sought an order and writ of maritime attachment pursuant to Rule B. The district court issued the writ, and ProShipLine garnished Aspen and seized

---

[6]The district court concluded that the writ had been improperly issued because ProShipLine and EP-Team had failed to sufficiently show that Aspen could not be "found" within the district, a requirement of Rule B. *ProShipLine, Inc. v. M/V Beluga Revolution*, 2007 WL 4481101, at *2-*3 (S.D. Tex. Dec. 18, 2007).

[7]In a one line, handwritten order, the district court ordered that "Motion granted, both parties being found in Texas."

approximately $2 million from Aspen's bank accounts. On January 16, 2008, Aspen moved to vacate the district court's order in the Second New York Action. The district court ruled in favor of Aspen on February 1, 2008, and vacated the writ.[8] ProShipLine appealed the district court's grant of this motion to the Second Circuit, which affirmed the district court. *ProShipLine, Inc. v. Aspen Infrastructures, Ltd.*, 585 F.3d 105, 110 (2d Cir. 2009) (affirming "solely on the ground that the district court did not err in concluding that [ProShipLine and Aspen] were both present in the Southern District of Texas").

## C

The parties brought their legal struggles to Washington on November 27, 2007, when ProShipLine and EP-Team filed another ancillary Rule B action in the Western District of Washington (the "Washington Action"). *See ProShipLine, Inc. v. Aspen Infrastructures, Ltd.*, No. C07-5660FDB, 2008 WL 859753 (W.D. Wash. Mar. 28, 2008). ProShipLine and EP-Team successfully obtained a writ of maritime attachment against Aspen. In light of the district court's order, Aspen posted security pursuant to Supplemental Admiralty and Maritime Claims Rule E(5) ("Rule E(5)") in lieu of allowing ProShipLine and EP-Team to garnish the fuel and lube oil aboard one of Aspen's chartered vessels within the district.

In December of 2007, a second ship chartered by Aspen, the M/V BELUGA FUSION (the "Beluga"), entered the Western District of Washington. ProShipLine and Aspen sought to garnish the fuel and lube oil aboard the Beluga. This

---

[8]The district court granted Aspen's motion because it concluded that the Agreement did not give rise to admiralty jurisdiction, that Aspen and ProShipLine were both present in the Southern District of Texas and that ProShipLine had abused the ex parte Rule B process by filing a separate suit against Aspen rather than making a counterclaim in the existing suit. *ProShipLine, Inc. v. Aspen Infrastructures, Ltd.*, 533 F. Supp. 2d 422, 427-29 (S.D.N.Y. 2008).

time, Aspen declined to provide security to substitute for garnishment of those resources. On December 27, 2007, the district court held an "emergency" hearing. The court rejected ProShipLine's and EP-Team's argument that it could compel Aspen to provide security.[9] Given the choice to either waive their right to garnish the property or take the resources despite alleged impracticability, ProShipLine and EP-Team removed the fuel and lube oil from the Beluga. With the fuel and lube oil in hand (or in container, as the case may be), ProShipLine and EP-Team moved for an order to authorize the sale of the property. On January 30, 2008, the district court issued the order permitting sale of the garnished property. *ProShipLine, Inc. v. Aspen Infrastructures, Ltd.*, No. C07-5660FDB, 2008 WL 276497 (W.D. Wash. Jan. 30, 2008). The property was subsequently sold.[10]

On February 12, 2008, Aspen moved to vacate the writ that the district court issued in the Washington Action and to exonerate the security held by ProShipLine and EP-Team pursuant to that writ. *ProShipLine, Inc. v. Aspen Infrastructures, Ltd.*, 2008 WL 859753 (W.D. Wash. Mar. 28, 2008). On March 28, 2008, the district court granted Aspen's motion and vacated the writ. The district court also ordered ProShipLine and EP-Team to return the full value of the garnished property.[11]

---

[9]ProShipLine and EP-Team sought security because they alleged that garnishment of the fuel and lube oil aboard the Beluga would be impracticable. Specifically, ProShipLine and EP-Team argued that due to the complexities involved in removing the fuel and lube oil from the Beluga, the cost of removal and storage would exceed the actual value of those resources.

[10]In accord with the sale, ProShipLine and EP-Team deposited an amount equal to the actual sale price of the fuel and lube oil—$64,129.50—into the court registry on March 17, 2008.

[11]Specifically, the district court ordered ProShipLine and EP-Team to pay Aspen an additional $28,092.06, the difference between the amount ProShipLine and EP-Team had deposited into the court registry and the fair market value of the garnished property at the time it was garnished. *ProShipLine, Inc. v. Aspen Infrastructures, Ltd.*, No. C07-5660FDB, 2008 WL 1757932, at *1 (W.D. Wash. Apr. 17, 2008).

The district court held that equitable vacatur was appropriate because the Agreement did not give rise to admiralty jurisdiction, res judicata applied from the Second New York Action and all of the parties were present within the same district.

ProShipLine and EP-Team moved for reconsideration on the ground that the district court had allegedly awarded damages to Aspen by ordering ProShipLine and EP-Team to reimburse Aspen. *ProShipLine, Inc. v. Aspen Infrastructures, Ltd.*, No. C07-5660FDB, 2008 WL 1757932 (W.D. Wash. Apr. 17, 2008). The district court denied the motion. The court concluded that the amount that ProShipLine and EP-Team had deposited into the court registry was less than the market value they had agreed upon prior to garnishment.

## II

We review an order vacating a writ of maritime attachment for abuse of discretion. *Equatorial Marine Fuel Mgmt. Servs. Pte Ltd. v. MISC Berhad*, No. 08-57046, 591 F.3d 1208, 1210 (9th Cir. 2010). We review the legal conclusions supporting such an order de novo. *Id.*

We review de novo a district court's decision that it lacked the legal capacity under the Admiralty Rules to order a party to post security in lieu of garnishment. *See Husain v. Olympic Airways*, 316 F.3d 829, 835 (9th Cir. 2002) (noting that conclusions of law are reviewed de novo), *aff'd*, 540 U.S. 644 (2004).

## III

The district court vacated ProShipLine's and EP-Team's writ of maritime attachment because it concluded that there was no valid maritime claim giving rise to admiralty jurisdiction. The district court also held that it was bound by res judicata to vacate the writ. The district court further concluded that attachment was improper because all of the parties were

present in the Southern District of Texas. On appeal to this court, Aspen offers a fourth reason that equitable vacatur was proper, arguing that ProShipLine and EP-Team violated 9 U.S.C. § 8 by seeking maritime attachment without diligently pursuing arbitration in Singapore. The district court properly vacated the writ as to ProShipLine. The district court, however, abused its discretion by vacating the writ as it pertains to EP-Team individually.

## A

**[1]** A party may only seek Rule B attachment if the underlying claim satisfies admiralty jurisdiction under 28 U.S.C. § 1333. The Supreme Court explains that a contractual claim gives rise to Section 1333 admiralty jurisdiction when the underlying contract is "maritime in nature." *Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd.*, 543 U.S. 14, 26 (2004). To make this determination, we must examine a contract to determine "whether the principal objective of a contract is maritime commerce." *Id.* at 25. In adopting this framework, the Supreme Court rejected the longstanding "spatial approach" to determining the maritime nature of contracts. *Id.* at 24-25. The Court instead held that a "conceptual approach" was needed because modern maritime commerce "is often inseparable from some land-based obligations." *Id.* at 25. The conceptual approach acknowledges this modern reality by examining whether the contract references "maritime service or maritime transactions." *Id.* at 24 (quoting *N. Pac. S.S. Co. v. Hall Brothers Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 125 (1919)).

The district court here did not examine the Agreement as required by *Norfolk Southern Railway Co.* The district court instead applied analysis employed by a few cases in the Southern District of New York. These cases suggest that whether a contract is maritime for the purpose of admiralty jurisdiction hinges upon whether the contract involves specific vessels and specific transactions. *See, e.g., Dolco Invs.*

*v. Moonriver Dev.*, 486 F. Supp. 2d 261, 267-68 (S.D.N.Y. 2007). The district court concluded that the Agreement was not a maritime contract because it did not make "reference to specific vessels or voyages."

**[2]** In so deciding, the district court abused its discretion. *Norfolk Southern Railway Co.* controls and should have been applied by the district court. Under the conceptual test adopted by the Supreme Court, the Agreement manifestly has maritime commerce as its "principal objective." The Agreement begins by stating that Aspen "seeks to utilize the services of [ProShipLine and EP-Team] in support of its efforts to book space on its vessels." ProShipLine's and EP-Team's primary obligations under the Agreement are to "secure freight and associated revenue," obtain "opportunities to add cargo to specific outbound voyages" and handle all "port and terminal handling operations" including "terminal facilitation, stevedoring, and heavy lift operations." Although many of these obligations are performed on land, there is no question that their sole purpose is to facilitate and make possible Aspen's international maritime operations.

**[3]** Contrary to the district court's conclusion, the Agreement gives rise to federal maritime jurisdiction under 28 U.S.C. § 1333. Our interpretation of the Agreement is in accord with the Second Circuit, which concluded that the Agreement has an "undeniably maritime flavor" under the *Norfolk Southern Railway Co.* conceptual test. *ProShipLine, Inc. v. Aspen Infrastructures, Ltd.*, 585 F.3d 105, 115 (2d Cir. 2009).

**B**

**[4]** Res judicata bars a suit when "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). We have further explained that res judicata applies when there is "(1)

an identity of claims; (2) a final judgment on the merits; and (3) identity or privity between parties." *Stewart v. U.S. Bancorp*, 297 F.3d 953, 956 (9th Cir. 2002).

The district court abused its discretion by concluding that it was bound by res judicata to vacate the writ to conform with the Southern District of New York's decision to vacate the writ involved in the Second New York Action. We examine four factors to determine whether there is an "identity of claims":

> (1) whether the two suits arise out of *the same transactional nucleus* of facts; (2) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (3) whether the two suits involve infringement of the same right; and (4) whether substantially the same evidence is presented in the two actions.

*Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 987 (9th Cir. 2005) (emphasis added). Whether two suits arise out of the "same transactional nucleus" depends upon "whether they are related to the same set of facts and *whether they could conveniently be tried together*." *W. Sys., Inc. v. Ulloa*, 958 F.2d 864, 871 (9th Cir. 1992) (emphasis added). Reliance on the transactional nucleus element is especially appropriate because the element is "outcome determinative." *Mpoyo*, 430 F.3d at 988; *see also Int'l Union v. Karr*, 994 F.2d 1426, 1429-30 (9th Cir. 1993).

**[5]** Here, the district court's application of res judicata was erroneous because there is no identity of claims. The appeal before us and the Second New York Action do not arise from the same "transactional nucleus." Although both cases involve similar sets of facts, the claim in this suit could not have been tried in the Second New York Action at all, much less conveniently. In order to bring a claim of maritime attachment within the Second Circuit, a plaintiff must allege that "the

defendant's property may be found within the district" where the garnishment action is being brought. *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.,* 460 F.3d 434, 445 & n.5 (2d Cir. 2006). The Southern District of New York is completely unable to entertain a claim seeking admiralty attachment of property on board a vessel, such as the Beluga, located in the Western District of Washington. Absent an identity of claims, res judicata cannot apply in this case.[12]

## C

**[6]** We have not previously had opportunity to elaborate upon equitable vacatur in the context of admiralty law. The Second Circuit, however, has described three narrow instances when, despite the plaintiff having successfully made a prima facie showing of entitlement to a writ of maritime attachment, equitable vacatur of that writ may be appropriate:

> [A] district court may vacate [a writ of maritime attachment] if the defendant shows . . . that 1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain *in personam* jurisdiction over the defendant in the district where

---

[12]The parties have been inconsistent in their use of the term "res judicata" in their briefing, sometimes referring to both claim and issue preclusion. It is also unclear from the district court's order whether its decision rests solely on claim preclusion or alternatively on both claim and issue preclusion. Insofar as the district court may have relied on issue preclusion, we conclude that none of the issues decided in the First New York Action has preclusive effect here.

First, the district court's conclusion in the Second New York Action that the contract is not a maritime contract was rejected by the Second Circuit on appeal and gives no basis for issue preclusion. Second, the district court's conclusion that ProShipLine was "present" in the Southern District of Texas is irrelevant to the issue of whether EP-Team is "located" there. *See* Part III.C, *infra.* And third, the possibility that ProShipLine abused the *ex parte* nature of Rule B attachment proceedings in the Southern District of New York is also irrelevant to the action before us.

the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise.

*Id.* at 445. Here, the district court held that equitable vacatur was appropriate based on its conclusion that the second situation described by the Second Circuit applied. The district court reasoned that ProShipLine and EP-Team had successfully obtained *in personam* jurisdiction over Aspen in the Southern District of Texas and that ProShipLine and EP-Team were both "present" in that district. Although we agree with and adopt the contours of equitable vacatur laid out by the Second Circuit, we disagree with the district court that the second situation applies to EP-Team.

**[7]** The second *Aqua Stoli Shipping* scenario describes the situation where a plaintiff, who is seeking a maritime writ in one district, is able to obtain *in personam* jurisdiction over the defendant in "the" district where the plaintiff is "located." Equitable vacatur is potentially warranted in such cases because the plaintiff is able to litigate against the defendant in the plaintiff's most convenient district. *See id.* at 444-45. We stress that this situation narrowly refers to "the" district where the plaintiff is located, not "a" district or "any" district where the plaintiff is located. This limited scenario allows for equitable vacatur only when the plaintiff could obtain *in personam* jurisdiction over the defendant in the federal district where the plaintiff has its most significant presence. Our understanding of the second *Aqua Stoli* situation is in complete agreement with the Southern District of New York, which has addressed this exact question. *See Peter Dohle Schiffahrts KG v. Sesa Goa Ltd.*, 642 F. Supp. 2d 216, 224 (S.D.N.Y. 2009) (holding that the second *Aqua Stoli* scenario "references 'the' district where the plaintiff is located . . . [a] concept closely align[ed] with the legal term 'domicile' "); *see also Aqua Stoli Shipping,* 460 F.3d at 445 (noting that equitable vacatur applies only in "limited circumstances").

**[8]** Under this analytic framework, the district court correctly concluded that equitable vacatur of the writ is warranted as to ProShipLine. There is no question that ProShipLine is "located" in the Southern District of Texas, the district where it has its principal place of business and most significant presence. Likewise, the record clearly indicates that ProShipLine could obtain *in personam* jurisdiction over Aspen in the Southern District of Texas because ProShipLine has repeatedly engaged Aspen in litigation in that district. Equitable vacatur of the writ as it pertains to ProShipLine was thereby warranted because ProShipLine could obtain *in personam* jurisdiction over Aspen in the district where ProShipLine is located.

**[9]** This analysis leads to a different result in regards to EP-Team. EP-Team is located in the Eastern District of Texas, the district where it has its most significant presence due to its principal place of business in Flower Mound, Texas.[13] There is no indication in the record that EP-Team could obtain *in personam* jurisdiction over Aspen in that district. Based upon these two entirely undisputed facts, the grant of equitable vacatur against EP-Team individually was an abuse of discretion because Aspen has not shown that EP-Team

---

[13]EP-Team's mistaken statement in its joint complaint in the Washington Action as to the location of its principal place of business does not warrant a different conclusion. The record does not indicate that the district court relied on the misstatement in making its decision. Moreover, EP-Team had little reason to suspect that its principal place of business would have any bearing upon this matter, considering that we had not previously embraced the doctrine of equitable vacatur in regards to maritime writs and that no circuit court in the nation had defined the exact contours of the second *Aqua Stoli Shipping* situation. Given the undisputed fact that EP-Team's principal place of business is actually in Flower Mound, the complete lack of reliance by the district court and the novel significance of EP-Team's principal place of business, we decline to bind EP-Team to its misstatement. *See Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009) (noting that a "court may disregard a stipulation if to accept it would be manifestly unjust or if the evidence contrary to the stipulation is substantial" (internal quotations and citation omitted)).

could obtain *in personam* jurisdiction over Aspen in the district where EP-Team is located.[14]

We disagree with Aspen's contention that judicial estoppel and the outcome of the First New York Action compel a different result. In the First New York Action, EP-Team's and Aspen's positions were reversed, prompting EP-Team, in its pursuit of equitable vacatur, to show that Aspen could obtain *in personam* jurisdiction over EP-Team in the district where Aspen was located. *See Aspen Infrastructures, Ltd. v. E.P. Team, Inc.*, 2008 WL 2663491, at \*1 (S.D.N.Y. 2008). In a one line, handwritten order, the district court concluded that EP-Team made that showing and equitably vacated the writ. Contrary to Aspen's assertion, EP-Team's position in that suit is in no way inconsistent with its position here. *See New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001) (holding that judicial estoppel may be warranted if, among other things, a party's later position is "clearly inconsistent" with its earlier position). There, EP-Team merely sought to demonstrate that it had sufficient presence in the Southern District of Texas for Aspen to exercise *in personam* jurisdiction over it there. Here, EP-Team asserts that its most significant presence is in the Eastern District of Texas, where it has its principal place of business. These two positions are entirely consistent and provide no basis for judicial estoppel.

**D**

Aspen argues that, in addition to the three reasons provided by the district court, equitable vacatur of the writ was also appropriate because ProShipLine and EP-Team violated 9 U.S.C. § 8 by allegedly seeking a Rule B writ without pursu-

---

[14]Because the district court abused its discretion in vacating the writ as to EP-Team, it also automatically abused its discretion by ordering EP-Team to pay Aspen the market value of the attached resources. We need not address ProShipLine's and EP-Team's argument that the order to reimburse Aspen constituted the entry of a money judgment.

ing arbitration in Singapore. The district court was "not convinced" by Aspen's argument. Neither are we.

**[10]** Section 8 provides:

> If the basis of jurisdiction be a cause of action otherwise justiciable in admiralty, . . . the party claiming to be aggrieved may begin his proceeding hereunder by libel and seizure of the vessel or other property of the other party . . . and the court shall then have jurisdiction to direct the parties to proceed with the arbitration . . . .

9 U.S.C. § 8. The Supreme Court interprets Section 8 as a Congressional declaration that "traditional admiralty procedure with its concomitant security should be available to the aggrieved party" despite the fact that the "parties had agreed to arbitrate." *The Anaconda v. Am. Sugar Refining Co.*, 322 U.S. 42, 46 (1944). The ability to pursue maritime attachment, however, does not lessen a party's "obligation to arbitrate [its] grievance." *Id*. Aspen argues that the district court properly vacated the writ because ProShipLine and EP-Team have not been diligent in pursuing arbitration in Singapore.

**[11]** Aspen's argument is weak on several counts. Neither the plain text of Section 8 nor the Supreme Court's interpretation of it suggests that the Section permits a district court to vacate a Rule B writ if it deems that the plaintiff is not pursuing arbitration. Aspen also fails to salvage its argument by citing any case in support of its novel understanding of Section 8. Moreover, even if we were to adopt Aspen's interpretation, it still would not apply here because the record is ambiguous as to which party has actually been at fault for the slow progress of the Singapore arbitration. The district court acted well within its discretion in concluding that Aspen's argument lacks merit.

**IV**

ProShipLine and EP-Team contend that the district court also erred by concluding that a district court lacks the legal capacity under the Admiralty Rules to order a party to post security in lieu of garnishment. The district court's conclusion was correct.

**[12]** Supplemental Admiralty and Maritime Claims Rule E(4)(b) ("Rule E(4)(b)") states that a marshal may, pursuant to a warrant, take possession of tangible property for safe custody or, in cases where "possession is impracticable," may "affix a copy [of the warrant] to the property in a conspicuous place." Rule E(5) provides that the "owner of any vessel may file a general bond or stipulation" to cause the execution of all processes against the vessel, such as garnishment, to be stayed provided that the bond or stipulation is sufficient.

**[13]** ProShipLine and EP-Team argue that, in the aggregate, these Rules empower a district court to order a party to post security in lieu of garnishment. Neither provision even remotely grants district courts such authority. Rule E(4)(b) refers to impracticability only in the sense that it allows a marshal to leave notice on property that is "impracticable" to possess. Rule E(5) is a permissive rule that allows garnishees to post security in lieu of having their property garnished. ProShipLine's and EP-Team's novel argument that these provisions allow courts to compel the posting of security in lieu of garnishment in instances of impracticability completely misinterprets the underlying rules.

**V**

**[14]** The district court abused its discretion by vacating the writ as it pertains to EP-Team. The writ shall be reinstated on behalf of EP-Team individually. Because the writ was improperly vacated as to EP-Team, the order to reimburse

Aspen for the value of the garnished property is also improper.

Each party shall bear its on costs on appeal.

**AFFIRMED in part, REVERSED in part and REMANDED.**

---

TALLMAN, Circuit Judge, concurring in part, dissenting in part:

I agree with the majority's analysis regarding ProShipLine, and concur in the opinion affirming the vacatur of the maritime attachment against that company. However, I disagree that the writ of attachment was appropriate as to EP-Team (and with the majority's conclusion that the district court erred in vacating it), and as to that portion of our court's opinion, I respectfully dissent. I would hold that the late Judge Franklin D. Burgess did not err under Rule E by vacating the Rule B writ of attachment against EP-Team.

The writ of attachment in maritime law has ancient roots. *See*, *e.g.*, *Manro v. Almeida*, 23 U.S. (10 Wheat.) 473 (1825). Historically, the writ served dual purposes: (1) to obtain *in personam* jurisdiction over the respondent, and (2) to ensure the availability of assets to satisfy a judgment in case the plaintiff succeeds on the merits. *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 693 (1950); *Polar Shipping Ltd. v. Oriental Shipping Corp.*, 680 F.2d 627, 636-37 (9th Cir. 1982). Rule B, entitled "In Personam Actions: Attachment and Garnishment," codifies the ability of a plaintiff to seek a writ of attachment in admiralty.

In *Equatorial Marine Fuel Mgmt. Servs. Pte Ltd. v. MISC Berhad*, 591 F.3d 1208, 1210 (9th Cir. 2010), we specified the elements for a Rule B writ of attachment: "(1) Plaintiff has a

valid prima facie admiralty claim against the defendant; (2) defendant cannot be found within the district; (3) property of the defendant can be found within the district; and (4) there is no statutory or maritime law bar to the attachment." *Id.* (citing *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006); Fed. R. Civ. P., Supp. R. B)). Noticeably missing from the list is a need for security to satisfy a future judgment. Indeed, Rule B specifically limits the use of attachment to those situations in which the defendant "is not found within the district," in other words, when the court does not (yet) have *in personam* jurisdiction over the defendant. Attachment solely to ensure satisfaction of a future judgment is not a basis for Rule B attachment.[1]

Turning from issuance of a writ of attachment to vacatur of it, Ninth Circuit jurisprudence interpreting when a Rule E vacatur is warranted is not well developed. In *Equatorial Marine Fuel*, we concluded that a court may order vacatur of a Rule B attachment under Supplemental Rule E(4)(f) if the "plaintiff failed to meet one of the four conditions for attachment" outlined above. 591 F.3d at 1210 (citing *Aqua Stoli Shipping*, 460 F.3d at 445). However, we did not discuss any other instance where vacatur might be an appropriate remedy.

Because of the absence of Ninth Circuit caselaw, my colleagues quite appropriately turned to a court with considerably more experience with Rule E vacatur for guidance, and adopted the test propounded by the Second Circuit in *Aqua Stoli Shipping*. Specifically, the majority endorsed the Second Circuit's listing of specific instances when equitable vacatur may be appropriate: "1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain *in personam* jurisdiction over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by

---

[1] Rule B(1)(e) specifies that seizure of property to secure satisfaction of a judgment is governed instead by Federal Rule of Civil Procedure 64.

attachment or otherwise." Maj. op. at 8262-63 (quoting *Aqua Stoli Shipping*, 460 F.3d at 445). Unfortunately, the majority mechanically recited this formulation then promptly ignored its rationale when applying the law to the facts of this case.

As the Second Circuit explained, maritime attachments arose because maritime parties are "peripatetic," so the availability of a writ of attachment to obtain *in personam* jurisdiction over a party avoids requiring a plaintiff to "scour the globe to find *a proper forum for suit* or property of the defendant sufficient to satisfy a judgment." *Id.* at 443 (emphasis added). Since obtaining *in personam* jurisdiction is a principal justification for authorizing a prejudgment writ of attachment, it follows that if the plaintiff can secure such jurisdiction over the defendant by some other means, then there is no need to attach property. Indeed, the Second Circuit concluded that vacatur of a writ of attachment "may be warranted when the defendant can show that it would be subject to *in personam* jurisdiction in another jurisdiction *convenient to the plaintiff*." *Id.* at 444 (emphasis added). Starting from this premise, the *Aqua Stoli Shipping* court then listed three circumstances in which equitable vacatur may be appropriate—the three circumstances quoted above—including two in which a defendant would be subject to *in personam* jurisdiction in a district convenient to the plaintiff.

Not only do my colleagues fail to consider the rationale behind the Second Circuit's list, they rigidly adhere to its formulation. Indeed, the majority devotes an entire page to parsing the meaning of "the district" and "located" in the phrase "the district where the plaintiff is located." Maj. op. at 8263. A careful reading of *Aqua Stoli Shipping*, however, shows that the Second Circuit intended no such precision, nor did it limit its application to "the federal district where the plaintiff has its most significant presence." Maj. op. at 8263. Before propounding the three prongs of its test, the Second Circuit first noted that "[a] maritime attachment would likewise be properly vacated if the plaintiff and defendant are both *pres-*

*ent* in the same district *and would be subject to jurisdiction there*, but the plaintiff goes to another district to attach the defendant's assets." *Aqua Stoli Shipping*, 460 F.3d at 444-45 (emphasis added). That is what happened here.

Whether the *Aqua Stoli Shipping* bases for vacatur are read literally or more broadly, I share my colleagues' recognition that ProShipLine is located in the Southern District of Texas and that Aspen is subject to *in personam* jurisdiction there. Accordingly, equitable vacatur was appropriate as to ProShipLine. We part ways, however, when the court's opinion concludes that there is a dearth of evidence in the record to support a finding that the Southern District of Texas would have jurisdiction over EP-Team, thus concluding that we must reinstate the writ as to that party.

First, EP-Team meets the *Aqua Stoli Shipping* test because it is "present in the same district [as defendant Aspen] and would be subject to jurisdiction there." *Id.* at 444-45. EP-Team acceded to *in personam* jurisdiction in the Southern District of Texas by choosing to file the underlying lawsuit against Aspen in that district, and EP-Team's counsel conceded jurisdiction there at oral argument. It is a basic tenet of personal jurisdiction jurisprudence that one subjects himself to the jurisdiction of the court where he brings suit. *See, e.g., Merchants' Heat & Light Co. v. James B. Clow & Sons*, 204 U.S. 286 (1907) ("[B]y setting up its counterclaim the defendant became a plaintiff in its turn, invoked the jurisdiction of the court in the same action, and, by invoking, submitted to it."); *SEC v. Ross*, 504 F.3d 1130, 1149 (9th Cir. 2007) ("[A] party cannot simultaneously seek affirmative relief from a court and object to that court's exercise of jurisdiction.").

EP-Team's consent to jurisdiction was not merely some "allegation" that it was subject to suit in that district. It willingly availed itself of the process and power of that court by choosing to file its complaint against Aspen there. It should not now be permitted to claim that it is not "present" or "lo-

cated" in the Southern District of Texas when it initiated the underlying claim in this case in that very court. *Freeman v. Bee Mach. Co.,* 319 U.S. 448, 454 (1943) (explaining that a corporation is found or present in a district for all purposes of a suit once it has invoked the jurisdiction of the federal court). For that reason, EP-Team's counsel candidly, and appropriately, conceded *in personam* jurisdiction at oral argument.

Moreover, the evidence that the Southern District of Texas is a more convenient forum than the Western District of Washington for EP-Team's action against Aspen is overwhelming. Even if EP-Team's principal place of business[2] is in Flower Mound, Texas, in the Eastern District, rather than Houston as EP-Team has repeatedly alleged, the federal district court in Houston is only some 270 miles from EP-Team's headquarters. The Tacoma, Washington, courthouse where this action began, on the other hand, is 2100 miles from EP-Team's headquarters. Further, as EP-Team has always retained the same attorneys as co-plaintiff ProShipLine, which is located in Houston, it is unclear what jurisdiction could be more convenient than Southern Texas. And, as ProShipLine was created by EP-Team and headquartered in Houston specifically to carry out the requirements of its Agreement with Aspen—the ultimate subject of this dispute—EP-Team already has, and in fact already created, substantial contacts with the Southern District of Texas that it lacks in the Western District of Washington. The Southern District of Texas is convenient to EP-Team; indeed, "the district has been convenient enough for [EP-Team] to have chosen to initiate litigation against Aspen in two separate actions there."

---

[2]The Supreme Court has recently clarified that the term "principal place of business" means, for purposes of federal diversity jurisdiction, the locale where a "corporation's high level officers direct, control, and coordinate the corporation's activities," often called the "nerve center." *Hertz Corp. v. Friend*, ___ U.S. ___, 130 S. Ct. 1181, 1186 (2010). It is unclear whether EP-Team meets this definition—or needs to—with respect to its claim that Flower Mound, Texas, is its principal place of business.

*ProShipLine, Inc. v. Aspen Infrastructures, Ltd.*, 585 F.3d 105, 117 (2d Cir. 2009).

Additionally, the underlying rationale for the issuance of a writ of maritime attachment was absent from this case since the beginning. EP-Team had already obtained *in personam* jurisdiction over Aspen in Texas when it sought this attachment. The goal of avoiding the need for EP-Team to "scour the globe to find a proper forum for suit" had already been achieved.[3] In fact, EP-Team candidly acknowledged that it sought the writ "to make more likely the collection" of any arbitration award—not to obtain *in personam* jurisdiction.

Finally, the record strongly suggests that maritime attachments are being employed by ProShipLine and EP-Team for the vexatious purpose of harassing Aspen in order to gain a tactical advantage in the pending commercial disputes among the parties in Singapore and Houston. I would hold that fact alone sufficient as a separate basis for granting equitable vacatur. Equity should not countenance such litigation tactics, even in a maritime case.

The district court did not abuse its discretion when it found equitable vacatur appropriate as to both ProShipLine and EP-Team. Because the majority holds otherwise as to EP-Team, I respectfully dissent from that part of the court's opinion.

---

[3] For a company providing global logistics management services, with offices in Texas, Florida, Connecticut, the Netherlands, France, Italy, Germany, and Singapore, which contracted with an Indian company and agreed to arbitration in Singapore following English law, it is unclear that "scouring the globe" would present much of a hardship. Indeed, EP-Team has voluntarily scoured this country to attach Aspen's assets wherever they may be found.